# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| LOIS HOWD et al. | : | |
|     Plaintiffs, | : | |
| | : | |
|       v. | : | 3:05-cv-814 (CFD) |
| | : | |
| UNITED FOOD & COMMERCIAL | : | |
| WORKERS UNION, LOCAL 919 et al. | : | |
|     Defendants. | : | |

## RULING ON MOTION FOR SUMMARY JUDGMENT

Plaintiffs Lois Howd and Lisa Weyel, members of the United Food and Commercial Workers Union, Local 919 ("Union" or "Local 919"), sued Local 919 and its President, Mark Espinosa ("Espinosa"), for claims arising out of negotiations and voting for a collective bargaining agreement. Specifically, the plaintiffs bring claims against Local 919 for violations of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, and for state law breach of contract of Local 919's bylaws and the International Constitution. Additionally, the plaintiffs bring a claim against Local 919 and Espinosa under the Labor Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. § 411. The defendants move for summary judgment. For the reasons that follow, the motion for summary judgment is granted.

## I.    **Background**[1]

Inventory-Takers Collective Bargaining Unit

Local 919 represents employees at the Stop & Shop Company ("Stop & Shop"). Stop &

---

[1]The following facts are taken from the parties' Local Rule 56(a) statements, summary judgment briefs, and other evidence submitted by the parties. They are undisputed unless otherwise indicated.

Shop has two separate collective bargaining agreements for two groups of Local 919 Stop & Shop workers. The first is the collective bargaining agreement, not at issue this lawsuit, for the approximately 9,000 general Stop & Shop workers. The second is the collective bargaining agreement ("inventory-takers CBA"), which is at the center of this lawsuit, for five Stop & Shop employees known as "inventory takers." Lois Howd and Lisa Weyel are inventory takers and are two of the five members of the inventory-taker collective bargaining unit ("inventory-taker unit"). The plaintiffs' jobs as inventory takers require them to drive to numerous Stop & Shop stores to oversee the inventory process. The inventory-taker CBA that went into effect in 2001 provided that inventory takers would be paid for the time spent driving to and from various Stop & Shop locations. This CBA was set to expire on August 14, 2004.

Local Bylaws[2] and International Constitution

Relevant to this lawsuit are several sections of the Local 919 Bylaws and the United Food & Commercial Workers International Union Constitution ("International Constitution"). First is the International Constitution's requirements for member input and voting on proposed collective bargaining agreements. In Article 23 of the International Constitution, entitled "Collective Bargaining Contracts," Section (D) provides that "affected membership may submit initial proposals for a collective bargaining contract or renewal of such a contract to the President of the Local Union involved . . . prior to the commencement of negotiations." After an initial proposal is approved by the affected membership, the President "shall meet with the employer and endeavor to arrive at an agreement. The current status of such meetings with the employer shall

_____

[2]The parties submitted two different versions of the Local Bylaws, but the versions are the same in all aspects relevant to this motion for summary judgment.

be reported as regularly as practical to the affected membership." Once the "proposal judged by

the President . . . to be the employer's final proposal for a collective bargaining contract or

renewal of an existing contract" is identified, it "shall be submitted to the affected membership

for its consideration. A majority vote of those present and voting shall be necessary to accept or

reject the proposal."

Also relevant is the proper procedure for filing charges against a member of the Local, as

well as the refiling and appeals procedure upon dismissal of charges. Article XIV, Section A(6)

of the Local Bylaws provides the requirements for filing disciplinary charges against a member

of the Local, as follows:

> The charges shall specify the Article or Articles of the International Constitution
> or laws or the Local Union bylaws or rules allegedly violated and shall also set
> forth a short and plain factual statement of the act or acts considered to be in
> violation, including available information as to date and places, in such a manner
> as to fairly inform the accused of the specific acts which are alleged to constitute
> violations of the International Constitution or laws or the Local Union bylaws or
> rules. Either upon motion by the charged parties or the Local Union Executive
> Board, charges failing to comply with this requirement shall be dismissed by the
> Local Union Executive Board, without prejudice to the refiling of charges within
> ten days which do comply with this requirement. Dismissal of refiled charges
> shall constitute final action, subject to appeals provided in Article 26(C) of the
> International Constitution.

Article 26(C) of the International Constitution provides the following appeals process:

> 1. . . . [T]he charging party when the accused has been acquitted[] may appeal to
> the International President for redress, subject to a further appeal to the
> International Executive Board.
> 2. A notice of appeal to the International President shall be filed no later than 15
> days from the date the adverse ruling is delivered to the appealing party. . . . A
> notice of appeal must briefly state why the party believes the decision should be
> reversed.
>
> . . .

4.  The appealing party may file a written statement in support of his or her appeal with the International President, stating wherein the decision being appealed is erroneous, within 40 days from the date the trial record is sent to the appealing party by the Local Union. . . . The other party may, within 30 days after such written statement has been sent to him or her, file a responsive statement. . . .

. . .

6. . . . After all statements have been or could have been filed, the International President shall consider the appeal and render a decision within three months of the date that all statements have been or could have been filed, unless the International President determines that the issues are of such complexity or the appeals pending are so numerous as to warrant an extension to four months, or unless both the charging and accused parties agree to an extension of time.
7.  Either party may appeal from the decision of the International President to the International Executive Board by filing a written notice of appeal with the International Secretary-Treasurer within 30 days of the date the decision. . . . The notice of appeal must briefly state why the party believes the International President's decision should be reversed, and it may also contain a more complete statement setting out wherein said decision is erroneous.

. . .

9. [The opposing party is allowed 30 days to file a responsive statement.]
10.  After the statements have been or could have been filed, the International Executive Board shall proceed to consider such appeal at its next regular meeting, unless both the charging and accused parties agree to an extension of time, and either affirm or reverse the decision of the International President.

Int'l Const. Art. 26(C).

The Local Bylaws make it mandatory for a union member to exhaust the International Constitution's appeals process before filing a lawsuit.  In particular, Article XIII, Section D of the Local Bylaws provides that "[n]o member shall institute an action outside the Union against the International Union, Local Union, or any of their officers or representatives without first exhausting all remedies provided by the Local Union bylaws and rules and the Constitution and laws of the International Union."

-4-

Collective Bargaining Agreement Negotiations

In anticipation of the inventory-takers CBA expiring on August 14, 2004, one of the

members of the inventory takers unit, Ed Keenan, sent on June 10, 2004 an email to Local 919

Secretary-Treasurer, James Wallace.  The email outlined several areas of concern that the

inventory takers wanted the Local to explore with Stop & Shop in negotiations for the next CBA.

Keenan's email stated that he had spoken with the plaintiffs and the other two inventory takers

and had "agree[d] on our contract desires."  Def. Ex. A-2.  The parties dispute whether the Union

also sent questionnaires to the inventory takers.  The plaintiffs claim that the Union did not send

the inventory-takers questionnaires prior to the 2004 contract negotiation, while Espinosa

testified at his deposition that because it is normal practice to send out questionnaires every three

years, he believed that questionnaires were sent out before the 2004 contract negotiation.

On June 14, 2004, Espinosa sent a letter to Joel Boone, the Stop & Shop representative,

to notify Stop & Shop that Local 919 would terminate or modify the inventory taker CBA set to

expire on August 14, 2004.  In July, Stop & Shop presented a proposal for a new CBA

("proposed inventory-taker CBA") that would alter the way inventory takers were paid for travel

time.  Under the proposed inventory-taker CBA, the inventory takers would not be paid wages

for the time they spent traveling from their "home stores," but instead would receive payment per

mile driven to and from the other store locations.

On July 16, 2004, Espinosa and other Union officials met with the members of the

inventory-takers unit to explain the proposed inventory-taker CBA.  The plaintiffs and other

members of the inventory-taker unit opposed the change in compensation for travel.  Specifically,

the plaintiffs argued that since they often have to spend many hours a day driving to and from

inventory sites, under the proposal they stood to lose pay for their hours spent driving, and the hours they spent driving would not be included in the computation of their 40-hour week for overtime purposes.  Espinosa did not take a vote at this meeting.

On August 27, 2004, Espinosa and other Union officials again met with the members of the inventory-takers unit to discuss ratification of the proposed inventory-taker CBA.  In the course of this meeting, Espinosa became frustrated with and swore at the inventory takers and stormed out of the meeting.  Although the meeting did eventually resume, Espinosa did not take a vote.

On September 3, 2004, the plaintiffs sent a letter to Espinosa requesting that two inventory takers be included in the Union's negotiating sessions with Stop & Shop.  In response, Espinosa asked Stop & Shop representative Boone to meet with the inventory takers unit.

On November 8, 2004,[3] Espinosa and other Union officials met with the members of the inventory-takers unit, Stop & Shop officials, and federal mediator John Carpino.  It is unclear exactly how this meeting unfolded, but Stop & Shop did modify their original proposed inventory-taker CBA to add a $500.00 bonus twice a year in response to concerns about travel compensation.

December 3, 2004 Vote

On November 17, 2004, Stop & Shop sent to Espinosa the proposed inventory-taker CBA, which included the altered payment for travel and the $500.00 semi-annual bonus.  A few days later, Espinosa mailed the proposed inventory-taker CBA to the members of the inventory-

---

[3]There was apparently also a meeting on September 17, 2004, but the parties have not discussed the details of that meeting.

taker unit for their votes by mail referendum.  The letter instructed the members to affix their

signature to authorize acceptance and return the form no later than December 3, 2004.  There was

not a place on the form to indicate a "yes" or a "no" vote.  See Def. Ex. A-6.  By the December 3,

2004 due date, the Union had received two "yes" votes.  While one of the members of the

inventory-takers unit returned the form with a "no" written in, this form was received after the

due date.  The plaintiffs–the remaining two members of the unit–did not return the form prior to

the due date, but claim that some of the inventory takers called Espinosa and other Union

officials to discuss the proposed inventory-taker CBA and the voting.  Espinosa testified at his

deposition that he did not receive any phone calls from members of the unit, and therefore he

interpreted the silence of the three non-returned forms as abstentions.  Based on the two "yes"

votes and three abstentions, Espinosa reported to Stop & Shop that the proposal had been

ratified.  The proposed inventory-taker CBA went into effect on January 1, 2005.

Plaintiffs' Charges Against Espinosa

On February 25, 2005, the plaintiffs filed charges with Local 919 alleging that Espinosa

had violated certain articles of the International Constitution and Local 919's Bylaws.[4]  On

March 10, 2005, the Executive Board notified the plaintiffs that it had dismissed their charges,

without prejudice, for lack of specificity pursuant to Local 919's Bylaws.  The plaintiffs' charges

did list several articles of the Local Bylaws and International Constitution, but did not

specifically apply the factual allegations made to the sections of the Bylaws and Constitution

_____

[4]In a separate letter dated February 25, 2005 to the President of the International, Howd
requested that an independent trial board hear the charges against Espinosa.  On April 4, 2005,
the President of the International denied Howd's request for an independent trial board on the
grounds that she had provided no basis for finding that the charges could not receive a fair and
independent hearing by the Local 919 Executive Board.

allegedly violated.  The defendants claim that Espinosa recused himself and was not present at the portion of the Executive Session wherein the charges against him were discussed.  The plaintiffs argue that Espinosa did not leave the room while the charges were discussed, and further claim that Local 919's attorney, William Gagne, pressured the Executive Board to dismiss the charges.  The Executive Board's notification of dismissal did not specifically alert the plaintiffs to the Bylaw's provision that they could refile the charges within ten days.  The plaintiffs did not refile within ten days, but rather refiled six weeks later, on April 22, 2005.

On the afternoon of May 23, 2005,[5] the Executive Board notified the plaintiffs that it "determined that even if re-filed charges had been timely filed, it would have dismissed them pursuant to Article 26(A)6, 8, and 9 of the International Constitution and Article XIV, Section(A)6, 8 and 9 of Local 919's By-law."  This notification did not alert the plaintiffs to their ability under the Local's Bylaws and International Constitution to appeal the dismissal to the International President within fifteen days.  The plaintiffs did not appeal.

Subsequent Votes and Ratification

On May 19, 2005, after questions were raised as to the validity of the December 3, 2004 vote, Espinosa resubmitted the proposed inventory-takers CBA for another vote.[6]  The responses to the second vote were due on June 6, 2005.  By June 6, 2005, Espinosa had received two "yes" votes and two "no" votes, and therefore the proposed CBA was not ratified.

_____

[5]The plaintiffs filed this lawsuit on the morning of May 23, 2005,

[6]Because the proposed inventory-taker CBA had gone into effect on January 1, 2005, Espinosa informed the unit that if it was approved by the second vote, everything would remain the same, but if it was rejected, the old contract would be reimplemented, with adjustments back to January 1, 2005.

-8-

On June 27, 2005, a meeting was held with the five members of the inventory-takers unit, Espinosa and other Union officials, Stop & Shop officials, and federal mediator Carpino.  The Stop & Shop officials said they would not modify the proposed CBA.  After some discussion, Ed Keenan moved for a vote to accept or reject the contract.  Before the group voted, Espinosa reminded the members that if the proposal was approved, the terms and conditions that had taken effect on January 1, 2005 would remain in effect, and that if the proposal were rejected, the terms and conditions of the old contract would be reestablished, with appropriate adjustments.  All five members of the bargaining unit voted, and the proposal was ratified three votes to two votes. The plaintiffs were the two members who voted against ratification.

The plaintiffs filed this lawsuit on May 23, 2005, before the Board's second dismissal of the charges against Espinosa and before the final vote ratifying the CBA.  In Count One, the plaintiffs claim Local 919 violated the LMRA, 29 U.S.C. § 185, by breaching the International Constitution in denying their claimed right to meaningful participation in the collective bargaining process and implementing the proposed CBA before it received a majority vote. Based on the same conduct, Count Two alleges violations of the International Constitution, as incorporated by Local 919's Bylaws, as a state law breach of contract claim.  Count Four alleges that Local 919 violated the LMRA by breaching its duty of fair representation in acquiescing when Stop & Shop hired inventory takers who were not Union-members.  Finally, Count Three alleges that Espinosa and Local 919 violated the plaintiffs' right to equal rights and privileges of every member of the labor organization, in violation of the LMRDA, at 29 U.S.C. § 411(a)(1). The plaintiffs seek compensatory and punitive damages, as well as emotional distress damages on the duty of fair representation claim.

The claims against the Union and Espinosa in this lawsuit are essentially the same charges against Espinosa that the plaintiffs filed with the Local 919 Executive Board.  In those charges, the plaintiffs claimed they lost hundreds of dollars a week for every week the contract was in place, and that "[t]he remedy the charging parties seek is to be made whole, including but not limited to compensation for money they have lost.  They also seek assurances that Brother Espinosa will not engage in the same behavior in the future."

As an initial matter, the plaintiffs cannot collect punitive damages for Counts One and Four under the LMRA.  See Int'l Bhd. of Elec. Workers v. Foust, 442 U.S. 42, 52 (1979) (LMRA breach of the duty of fair representation); Monaco v. Smith, No. 00 Civ. 5845(RMB), 2004 WL 203009, at *5 (S.D.N.Y. Feb. 2, 2004) (LMRA breach of contract).  Punitive damages are also generally not available for state law breach of contract claims as presented in Count Two, Lydall, Inc. v. Ruschmeyer, 919 A.2d 421, 443 n.24 (Conn. 2007), and damages for emotional distress for a breach of the duty of fair representation in Count Four are only available in "exceptional cases of extreme misconduct," Soto Segarra v. Sea-Land Service, Inc., 581 F.2d 291, 298 (1st Cir. 1978).

## II.   Summary Judgment Standard

In a summary judgment motion, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).  A court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P.

56(c)); accord Miner v. Glen Falls, 999 F.2d 655, 661 (2d Cir. 1993). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

Where the nonmoving party has the burden of proof at trial, the moving party need only demonstrate that there is a lack of evidence to support the nonmovant's claim. Celotex, 477 U.S. at 323-25; Tops Mkts., Inc. v. Quality Mkts., Inc., 142 F.3d 90, 95 (2d Cir. 1998). Once the movant has established a prima facie case demonstrating the lack of a genuine issue of material fact, the nonmoving party must provide enough evidence to support a jury verdict in its favor. Anderson, 477 U.S. at 248; Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991). A plaintiff, as the nonmovant, may not rely on conclusory statements or mere contentions that the evidence in support of summary judgment is not credible. Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993). Similarly, a plaintiff may not rest "merely on allegations or denials" in its complaint to demonstrate the existence of a genuine issue of material fact. Fed. R. Civ. P. 56(e). Therefore, after discovery, if the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then summary judgment is appropriate. Celotex, 477 U.S. at 323. When addressing a motion for summary judgment, the Court resolves "all ambiguities and draw[s] all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir. 1992). Thus, "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." Bryant, 923 F.2d at 982.

III.    **Discussion**

-11-

A.     **Exhaustion of Internal Union Remedies**

There is no dispute that the plaintiffs did not refile their charges against Espinosa within the time allotted, and also never appealed the Executive Board's decision as provided for in Article 26(C) of the International Constitution.  The defendants argue that the Court should grant summary judgment because the plaintiffs did not exhaust their internal union remedies.

"Under both the LMRA and the LMRDA, the requirement that a plaintiff exhaust internal union remedies lies within the court's discretion."  Maddalone v. Local 17, 152 F.3d 178, 186 (2d Cir. 1998) (citing Clayton v. Int'l Union, UAW, 451 U.S. 679, 689 (1981)).  In determining whether to apply the exhaustion doctrine, the Court must "balance the right of union members to institute suit against the policy of judicial noninterference in union affairs."  Maddalone, 152 F.3d at 186 (quoting Johnson v. General Motors, 641 F.2d 1075, 1079 (2d Cir. 1981).  Three factors are relevant to this inquiry:

> First, whether union officials are so hostile to the employee that he could not hope to obtain a fair hearing on his claim; second, whether the internal union appeals procedures would be inadequate either to reactivate the employee's grievance or to award him the full relief he seeks . . . ; and third, whether exhaustion of internal procedures would unreasonably delay the employee's opportunity to obtain a judicial hearing on the merits of his claim.

Clayton, 451 U.S. at 689.  "Accordingly, a court should first allow union officials to interpret the union's constitution, even if the court might reach a different interpretation."  Bennett v. Saunders, No. 99 Civ. 0854(SAS), 1999 WL 529539, *2 (S.D.N.Y. July 23, 1999).  The LMRDA also has a specific provision relating to exhaustion, as follows:

> No labor organization shall limit the right of any member thereof to institute an action in any court, or in a proceeding before any administrative agency, irrespective of whether or not the labor organization or its officers are named as defendants or respondents in such action or proceeding, or the right of any

member of a labor organization to appear as a witness in any judicial, administrative, or legislative proceeding, or to petition any legislature or to communicate with any legislator: *Provided, That any such member may be required to exhaust reasonable hearing procedures (but not to exceed a four-month lapse of time) within such organization, before instituting legal or administrative proceedings against such organizations or any officer thereof.*

29 U.S.C. § 411(d) (emphasis added).  Thus, the LMRDA specifically provides that a plaintiff may be required to exhaust internal union remedies for a period of four months before instituting legal action.

State law provides a similar doctrine of exhaustion of internal union remedies.  See Labbe v. Pension Comm'n of City of Hartford, 643 A.2d 1268, 1273 (Conn. 1994) ("It is well settled under both federal and state law that, before resort to the courts is allowed, an employee must at least attempt to exhaust exclusive grievance and arbitration procedures, such as those contained in the collective bargaining agreement between the defendant and the plaintiffs' union." (internal quotation marks omitted)).  In fact, under state law, exhaustion is a jurisdictional requirement, and "[f]ailure to exhaust the grievance procedures deprives the court of subject matter jurisdiction."  Id.  Connecticut law does, however, provide exceptions to the exhaustion doctrine, including when an administrative remedy is inadequate or futile.  Id. at 1274.  A remedy is futile, for example, when the outcome of seeking a remedy is "effectively predetermined."  Id.  "A mere claim of probable bias . . . has been held insufficient to avoid an exhaustion requirement."  Cahill v. Bd. of Educ. of City of Stamford, 502 A.2d 410, 417 (Conn. 1985).

The plaintiffs' claims pursuant to the LMRA in Counts One and Four allege that Local 919 breached the International Constitution and the duty of fair representation.  Considering the three Clayton factors, the Court finds that dismissal of the LMRA counts is appropriate because

the plaintiffs failed to exhaust their internal union remedies.  The plaintiffs have produced no

evidence under the first <u>Clayton</u> factor that the Local 919 Executive Board, or the International

President on appeal, would have been so hostile to them that they could not hope to obtain a fair

hearing on their claims against Espinosa.  The International Constitution Article 26(C) provides

that "the charging party when the accused has been acquitted[] may appeal to the International

President for redress."  Article XIII, Section D of the Local Bylaws makes it mandatory for a

union member to exhaust the International Constitution's appeals process before filing a lawsuit.

Here, the plaintiffs not only did not wait for a decision from the Executive Board on their refiled

charges before filing this lawsuit, but also did not file an appeal in accordance with the

International's appeal procedure, which is simple and straightforward, merely requiring that a

"notice of appeal" be filed that "briefly state why the party believes the decision should be

reversed."  <u>See</u> <u>Maddalone</u>, 152 F.3d at 186.

        The International Union's procedure is not inadequate under the second <u>Clayton</u> factor to

reactivate the plaintiffs' grievance or to award them the full relief they seek.  Through the appeals

process, the International Union could have reactivated the plaintiffs' grievance against Espinosa.

Moreover, to the extent that the plaintiffs claim monetary damages for loss of travel

compensation under the new CBA, their claim is moot because the June 27, 2005 vote approved

the proposed-CBA, including ratification back to the January 2005 implementation.  <u>Cf.</u> <u>Farrell</u>

<u>v. Hellen</u>, 367 F. Supp. 2d 491, 500 (S.D.N.Y. 2005) ("[A]n internal union procedure need not be

exhausted if it does not offer all of the relief sought by the plaintiff, including monetary

damages.").  Finally, as noted above, the plaintiffs cannot claim under the LMRA punitive

damages, see Monaco v. Smith, No. 00 Civ. 5845(RMB), 2004 WL 203009, at *5 (S.D.N.Y.

Feb. 2, 2004) (noting that punitive damages are not available under 29 U.S.C. § 185), or damages

for emotional distress, see Soto Segarra v. Sea-Land Service, Inc., 581 F.2d 291, 298 (1st Cir.

1978) (noting that emotional distress damages should be awarded in fair representation suits only

in "exceptional cases of extreme misconduct"); Capitano v. Laborers Intern. Union of North

America, No. 97-CV-0035A, 2000 WL 424202, *14 (W.D.N.Y. 2000) ("It is settled that no

recovery for . . . emotional distress lies under the LMRA.").

Third, exhaustion of internal union procedures would not unreasonably delay the

plaintiffs' opportunity to obtain a judicial hearing on the merits of the LMRA claims.  Article

26(C) of the International Constitution sets forth specific briefing deadlines and requires that the

International's President issue his decision within three months of submission of the parties'

briefing statements.  While appeal to the International President likely would have taken more

than four months, the LMRDA's four month exhaustion limitation does not control exhaustion

under the LMRA.  See Local 323 v. Int'l Union of Electronic, Elec., Salaried, Mach. & Furniture

Workers, 160 F. Supp. 2d 500, 507 (W.D.N.Y. 2001).

The plaintiffs' claim that resort to the International Constitution's remedies would be

futile is not supported by the evidence.  The Court need not accept as true the plaintiffs'

speculation about the International Union's bias.  See Maddalone, 152 F.3d at 187 ("Maddalone

contends on appeal that the procedures mandated by section 53(G) were futile because the

General President would have been reluctant to expose the wrongdoings of Local 17. . . . This

claim is based on speculation, however. . . . Since he never gave the International this chance to

remedy the alleged misconduct internally, we cannot know that the International would have

ignored Maddalone's claims."); Thompson v. Local 144, No. 99 Civ.11503 (RCC), 2001 WL

293930, * 4 (S.D.N.Y. March 27, 2001) ("If the Court were to hold that exhaustion would be futile because internal remedies would be reviewed by the same organization whose actions were being challenged, and would amount to an exception that swallows the whole."); Rodriguez v. Haynes, 341 F. Supp. 2d 416, 425 (S.D.N.Y. 2004) ("Without having alleged that the designated recipients of the complaints or the bodies designated to review the complaints were hostile, plaintiffs cannot support their contention that exhausting internal remedies would have been futile.").  Here, the plaintiffs have not supported their claim of futility with any evidence.

Finally, the Local and International's appeal procedures are reasonable.  To appeal, the plaintiffs simply had to, within fifteen days of the Local Executive Board's decision, send to the International "a notice of appeal [that] briefly state[s] why the party believes the decision should be reversed."  Although the Executive Board's letter did not inform the plaintiffs of the appeal procedures, where the appeals process was referenced in the Local 919 Bylaws, and was specifically described in the International Constitution, it is reasonable to expect the plaintiffs to be familiar with the relatively simple procedures.  In Maddalone, for example, where the appeal procedure "was contained in the union's Constitution and Rules" and "provided a straightforward procedure whereby members could set forth any grievances to the General President," the Second Circuit held that the plaintiff had not sufficiently exhausted his internal union remedies even though the Local and District Council did not specifically inform the plaintiff of the existence of the appeal procedure.  152 F.3d at 187; see also Henry v. Cmty. Res. Ctr., Inc., No. 95 Civ. 5480, 1996 WL 251845, *7 (S.D.N.Y. 1996) ("Assuming Henry was truly unaware that the two Union review Boards had the ability to reverse the Union's decision not to submit her grievance to arbitration, such a lack of knowledge regarding internal union procedures is not a defense to

-16-

Henry's failure to exhaust.").

Therefore, the Court dismisses Counts One and Four under the LMRA for failure to exhaust internal union remedies.  See, e.g., Paulino v. New York Printing Pressman's Union, Local Two, No. 07-2425-cv, 2008 WL 5083493 (2d Cir. Dec. 3, 2008).  For the same reasons, the Court will dismiss the plaintiffs' state law claim in Count Two.[7]  However, because the LMRDA specifically provides for only a four-month exhaustion requirement, and it is clear that the International Constitution's appeal process provided for more than two months of briefing and another three months for the President to issue a decision, the Court will not dismiss the LMRDA claim on the basis of the plaintiffs' failure to exhaust.[8]  See Farrell v. Hellen, 367 F. Supp. 2d 491, 500 (S.D.N.Y. 2005) ("But while a Union member 'may be required to exhaust reasonable hearing procedures,' that requirement no longer applies after charges have been pending for more than four months." (quoting 29 U.S.C. § 411(a)(4))).

**B.    LMRDA Claim**

In Count Three, the plaintiffs claim that the defendants denied them equal rights and privileges of the International Constitution and Local 919's bylaws in violation of 29 U.S.C. § 411(a)(1).  The LMRDA has been called a "Bill of Rights" that guarantees union members the equal right to vote and participate in union decisions, the right to free speech and assembly, and protection from improper discipline by union officers.  Local No. 82 v. Crowley, 467 U.S. 526,

---

[7]The defendant also argues that Count Two is preempted by the LMRA.  The Court does not reach this issue because it dismisses Count Two for failure to exhaust internal union remedies.

[8]While it is true the plaintiffs did not wait four months from the date of their first filing charges to the date they filed suit, the Court will not dismiss based on exhaustion because it is evident that any appeal to the International would likely have taken more than four months.

536-37, (1984).  Section 101(a)(1) the LMRDA provides:

> Every member of a labor organization shall have equal rights and privileges
> within such organization to nominate candidates, to vote in elections or
> referendums of the labor organization, to attend membership meetings, and to
> participate in the deliberations and voting upon the business of such meetings,
> subject to reasonable rules and regulations in such organization's constitution and
> bylaws.

29 U.S.C. § 411.  The Second Circuit has "read § 101(a)(1) to prohibit the unequal treatment of

union members with respect to their voting rights."  Members For a Better Union v. Bevona, 152

F.3d 58, 63 (2d Cir. 1998).  The Section "is no more than a command that members and classes

of members shall not be discriminated against in their right to nominate and vote.  And Congress

carefully prescribed that even this right against discrimination is subject to reasonable rules and

regulations by the union."  Id. (quoting Calhoon v. Harvey, 379 U.S. 134, 139 (1964)).  "Under

Calhoon, 'voting rights protected by Section 101(a)(1) must be directly attacked to warrant

suit.' " Id. (quoting Navarro v. Gannon, 385 F.2d 512, 520 (2d Cir.1967)).

The plaintiffs claim unequal treatment in the following: (1) that prior to the CBA

negotiations, they were not given the opportunity to fill out questionnaires; (2) that Espinosa

swore at them during one of the meetings; and (3) that the proposed inventory-taker CBA was

implemented before it had been approved by a majority vote.

The plaintiffs' claims that they were treated unfairly in not having been sent

questionnaires and in Espinosa swearing at them are insufficient to state a LMRDA claim

because this alleged discrimination is not directly related to their right to vote.  Moreover, the

plaintiffs' claim that they were discriminated against by the fact that the CBA was implemented

before it had been approved by a majority vote also fails because it is undisputed that the

plaintiffs and the other inventory takers all had equal rights to vote in the three votes that were

-18-

held on the proposed CBA.  Specifically, in first vote, the plaintiffs had equal opportunity to send in their ballots by December 3, 2004, and in the second vote, the plaintiffs had equal opportunity to send in their ballots by June 6, 2005.  Additionally, even if the mail referendum ballots were defective, the plaintiffs had another equal opportunity to vote in-person on June 27, 2005, when the proposed inventory-taker CBA was ratified by a majority of the unit.  Therefore, there is no genuine issue of material fact that the plaintiffs were discriminated against in the their right to vote.

Furthermore, any claim based on the proposed CBA being implemented before it was accepted by a majority of the unit is moot, as a majority of the unit on June 27, 2005 approved the proposed CBA, including retroactive application to January 1, 2005.  See Sears v. Auto. Carriers, Inc., 526 F. Supp. 1143, 1146 (E.D. Mich. 1981), aff'd, 711 F.2d 1059 (6th Cir. 1983) ("It is well established that the LMRDA is not designed to deal with hypothetical injuries. Courts have not hesitated to dismiss LMRDA claims on the ground of mootness.  Indeed, the LMRDA mootness doctrine has been applied to . . . claims based on inconsequential election improprieties."); see also Local 445 v. Int'l Bhd. Teamsters, 87 LRRM 3219 (S.D.N.Y. 1973). Therefore, the plaintiffs' claim under the LMRDA also fails.

**IV.**     <u>**Conclusion**</u>

For the reasons set forth above, the defendants' motion for summary judgment [Dkt. #

52] is granted.  The Clerk is directed to close this case.

SO ORDERED this   <u>25th</u>   day of August 2009, at Hartford, Connecticut.




                     <u>**/s/ Christopher F. Droney**</u>
                     **CHRISTOPHER F. DRONEY**
                     **UNITED STATES DISTRICT JUDGE**